**ASPEN LIMOUSINE SERVICE, INC. d/b/a Vans To Vail, Inc., Plaintiff,**

v.

**COLORADO MOUNTAIN EXPRESS, INC., Defendant.**

Civ. A. No. 95–K–1345.

United States District Court, D. Colorado.

June 21, 1995.

James A. Beckwith, Arvada, CO, plaintiff.

David E. Driggers, Thomas J. Burke, Jr., Jones & Keller, P.C., Denver, CO, defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

On May 26, 1995, Plaintiff Aspen Limousine Service, Inc. d/b/a Vans to Vail, Inc. ("ALS")[1] filed a complaint and motion for preliminary injunction under the so-called self-help provisions of the Interstate Commerce Act, 49 U.S.C. § 11708, alleging violations of various provisions of 49 U.S.C. § 10922 by Colorado Mountain Express, Inc. ("CME"). A certificate of compliance under D.C. Colo. LR 7.1 was filed.

On June 1, 1995, I ordered Colorado Mountain Express, Inc. to appear on June 15, 1995, to show cause why I should not issue a preliminary injunction restraining the performance of any scheduled passenger service under Docket No. MC–169174, issued by the Interstate Commerce Commission ("ICC").

On June 13, 1995, ALS filed a motion in limine regarding the preliminary injunction hearing and, on June 14, 1995, filed a supplement to the memo in support of the motion in limine. On June 14, 1995, CME filed a brief in opposition to the motion for preliminary injunction.

On June 15, 1995, the parties submitted a stipulation in lieu of the testimony and documentary evidence which would otherwise have been presented at the evidentiary hearing scheduled for that day. According to the stipulation, ALS' motion in limine was withdrawn and the matters raised therein considered as additional legal argument directed to the motion for preliminary injunction. Certain exhibits tendered by the parties were admitted into evidence.

For the reasons which follow, I deny the motion for preliminary injunction.

### I. *Parties' Contentions.*

This action is brought pursuant to 49 U.S.C. § 11708, entitled "Private enforcement: motor carrier and household goods freight forwarder licensing." That section provides in pertinent part:

(a) If a person provides transportation by motor vehicle ... in clear violation of section [10922] of this title, a person injured by the transportation ... may bring a civil action to enforce any such section. In a civil action under this subsection, trial is in the judicial district in which the person who violated that section operates.

49 U.S.C. § 11708(a).

Section 10922(c)(2)(A)–(I) authorizes the ICC to award a common carrier of passengers by motor vehicle a certificate or certificates of public convenience and necessity authorizing the transportation of passengers, both in interstate and intrastate commerce, over regular routes. Section 10922(c)(2)(J) enacted in 1987 provides:

LIMITATION ON INTRASTATE CERTIFICATES: Each certificate issued under this paragraph to provide intrastate transportation of passengers on any route shall be subject to a condition which limits the authority of the carrier to provide intrastate transportation service under the certificate only if the carrier provides the regularly scheduled interstate transportation service on the route.

ALS contends that its competitor CME, which holds such ICC certificates is currently not operating them in accordance with applicable legal requirements, which ALS asserts

---

**1.** ALS is a bankrupt debtor-in-possession under Chapter 11 of the Bankruptcy Code. As pointed out in 5 *Collier on Bankruptcy* ¶ 1107.02 (15th Ed.1993), "[s]ection 1107(a) requires the debtor in possession to perform all the functions and duties of a trustee in a chapter 11 case...." The code in turn provides "the trustee in a case under this title has capacity to sue and be sued." 11 U.S.C. § 323(b).

is a "clear" violation of 49 U.S.C. § 10922. ALS holds Colorado Public Utilities Commission ("PUC") authority duplicating the intrastate schedule operated by CME.

ALS further contends CME is engaged or about to engage in the expansion of its already unlawful service between points in Pitkin County, Colorado and other points in the state, as a consequence of which ALS, a debtor in possession in the United States Bankruptcy Court will allegedly be irreparably harmed absent the requested injunctive relief. ALS requests also that if the preliminary injunction is granted, it be relieved from having to obtain the bond otherwise required by Federal Rule of Civil Procedure 65.

In its complaint, incorporated into its motion for preliminary injunction, ALS seeks to enjoin the unlawful practices CME is allegedly engaged in or about to begin under its ICC certificates and further requests a declaration CME has abandoned its certificates and that its certificates are void and invalid. (Compl. at 5.)

The motion for preliminary injunction seeks an order prohibiting CME from conducting scheduled passenger transportation service within the State of Colorado under its ICC certificates, alternatively, prohibiting CME from conducting any scheduled passenger service between Denver International Airport ("DIA"), on the one hand, and, on the other hand, points in Summit, Garfield, and Pitkin Counties, pending the trial of the complaint on the merits.

CME asserts the requested relief should be denied because (1) CME is in compliance with all requirements of its certificates, more particularly including transporting a "substantial" number of interstate passengers over its routes; (2) this court lacks jurisdiction under 49 U.S.C. § 11708 to enjoin all of CME's operations, to make a finding of abandonment, or to revoke the operating authorities issued to CME by the ICC; And (3) any violation alleged is less than "clear," a finding of which is a jurisdictional prerequisite to granting injunctive relief under 42 U.S.C. § 11708.

## II. *Background.*

CME operates under three certificates of public convenience and necessity issued by the ICC, which authorize CME to transport passengers over regular routes pertinently between Denver International Airport ("DIA") in Denver, Colorado, and points in Eagle and Pitkin Counties. Each of these certificates authorizes the regular route transportation of passengers, both in interstate and intrastate commerce, subject to the requirement imposed by Congress in 1987 that such operations include "regularly scheduled interstate transportation service on the route."

CME has for some time operated a regular, scheduled passenger transportation service between Stapleton International Airport, and, since February 1995, between DIA and authorized intermediate points in Eagle County, concerning which CME and ALS have been longstanding competitors. CME has been authorized, since 1993, by joining or "tacking" its certificate authorizing transportation between the Eagle, Colorado airport (in Eagle County) and points in Pitkin County at a common point of service within its pre-existing authority to serve points in Eagle County, a practice CME maintains is specifically contemplated under the terms of CME's certificate issued in 1993. As a result of this "tacking," CME maintains, it is authorized to render a "through" regular route service between DIA and points in Pitkin County. Until ALS ceased providing a regular route service for a time, followed by its reinstitution of reduced service consisting of one scheduled trip per day, and then sought relief under Chapter 11 of the Bankruptcy Code, CME had not directly competed with ALS rendering "through" service between DIA and points in Pitkin County.

CME asserts ALS's bankruptcy filing and sharply reduced service created an immediate demand for the institution of additional regular route passenger service to Pitkin County which CME is now in the process of providing in its initial phases. CME maintains it is the institution of this service which brought about ALS' present motion for a preliminary injunction.

ALS focuses on a filing by CME of reports (which CME claims were mistaken and inadvertent) which ALS claims demonstrate the insubstantial nature of CME's interstate operations and its consequent inability lawfully to transport intrastate passengers. CME asserts, to the contrary, that it has transported over 111,000 passengers in calendar year 1994 under its ICC certificates, over 25% of whom consisted of interstate passengers, i.e. those whose origin or destination lay outside of Colorado and whose transportation on a through basis had been prearranged.

### III. *Interstate Commerce Commission.*

Subsection (b) of 49 U.S.C. § 11708 requires a copy of the complaint be served on the ICC which may intervene in any suit brought under subsection (a). If the ICC notifies the district in which the action is pending that it intends to consider the matter that is the subject of the complaint in a proceeding before the commission, the district court "shall stay further action pending disposition of the proceeding before the commission." *Id.* (b).

ALS served a copy of the complaint and all related pleadings upon the I.C.C. (Compl. ¶ 10.) In response, the Regional Counsel for the ICC addressed a letter dated June 8, 1995, to Counsel for ALS. (Def.'s Ex. D.) The letter states ICC certificates remain in effect unless revoked by the ICC and there is no authority to support ALS' contention that the ICC certificates issued to CME have been involuntarily revoked because of abandonment. Nor, states counsel for the ICC, does the district court have the authority to revoke such certificate for any reason.

The letter states: "If there are insufficient bona fide interstate operations to support the intrastate operations, the result is a [sic] operation in violation of *State* law, not federal law." (*Id.,* at 1–2.) Counsel for the ICC does not believe ALS has alleged any specific violation under the Interstate Commerce Act and therefore does not believe this court has jurisdiction under 49 U.S.C. § 11708. (*Id.* at 2.) The letter suggests a better way to proceed would be for ALS first to seek an ICC declaratory order finding that CME's operations are not authorized by its ICC certificates and then "to use the ICC opinion

in seeking State Court remedies based upon state law violations." (*Id.*) "Since I cannot find any violation of the Act we administer, I do not see any basis or need for our enforcement staff to become involved in the proceeding." (*Id.*)

It is apparent from this letter that the ICC does not intend to intervene in this request for a preliminary injunction. ALS maintains "both CME and ALS dispute Mr. Day's interpretation of this Court's jurisdiction." (Pl.'s Statement Mot. Prelim. Inj. at 12 n. 6.) Clearly, however, CME is in agreement with counsel for the ICC with regard to this court's lack of power to revoke ICC certificates.

Even if I do not have the power to revoke an ICC certificate, ALS states the complaint seeks injunctive relief with regard to alleged violations of the ICC certificates. ALS asserts *Quality Exchange, Inc. v. Universal Air Freight, Inc.,* 574 F.Supp. 622 (W.D.N.C. 1983) "clearly allows this action before this court." (Pl.'s Statement Mot. Prelim. Inj. at 12 n. 6.) In *Quality Exchange,* the plaintiff did not seek revocation of an existing certificate but to enjoin the defendant from providing land freight forwarding services without the requisite ICC permit. The district court found the evidence established a "clear violation" of Title 49 for its jurisdictional purposes because "[t]he Commission's decisions are clear and do not leave the court in doubt as to how the defendant's behavior would be interpreted if the Commission were to exercise its discretionary right of primary jurisdiction." *Quality Exchange,* 574 F.Supp. at 625. The court went on to decline the motion for preliminary injunction on the grounds that "neither party has presented sufficient evidence of hardship to justify equitable relief." *Id.* at 626.

As discussed below, I deny the motion for preliminary injunction, *inter alia,* because I conclude ALS has not established a clear violation by CME of its ICC permits.

### IV. *Preliminary Injunction.*

A party seeking injunctive relief must establish: "(1) there is a substantial likelihood of prevailing on the merits; (2) it will suffer irreparable injury unless the injunc-

tion issues; (3) the threatened injury to it outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest." *Metro Brokers, Inc. v. Tann,* 815 F.Supp. 377, 382 (D.Colo.1993).

■ ALS asserts I may enjoin CME under 49 U.S.C. § 11708 without proof of the normal criteria for a preliminary injunction under Federal Rule of Civil Procedure 65. In this regard, ALS relies on *Quality Exchange, Inc. v. Universal Air Freight, Inc.,* 574 F.Supp. 622 (W.D.N.C.1983). However the *Quality Exchange* court expressly stated it was guided by the rule in *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir.1977) in determining whether a preliminary injunction should issue. The court in *Blackwelder* enunciated the same four criteria for granting a preliminary injunction as those described above and reversed the district court "because it failed to apply the settled principles which govern consideration of a Rule 65(a) motion." *Id.* at 193.

ALS' contention that the normal criteria for granting a preliminary injunction do not apply is without foundation. I consider each of these criteria in turn.

### (1) *Success on the Merits.*

■ ALS argues it has a substantial likelihood of succeeding on the merits because on the face of CME's verified annual reports, filed with the Colorado PUC, CME has either not performed any interstate service scheduled service or has not performed a sufficient volume of such service to validate its "intrastate/interstate" scheduled authority.

CME contends ALS cannot sustain its initial burden because (a) I lack jurisdiction to grant the broad relief requested and because ALS cannot show CME is in "clear violation" of 49 U.S.C. § 10922; (b) the passenger traffic which is considered "interstate" in nature is wider in scope than that alleged by ALS; (c) CME provides a "substantial" interstate service over the involved route.

■ Under 49 U.S.C. § 11708, I have jurisdiction to grant the requested injunctive relief only if there is a "clear violation of section [10922]." "[T]his requirement is a standard of jurisdiction rather than a burden of proof." *Aaacon Auto Transport, Inc. v. Medlin,* 575 F.2d 1102, 1104 (5th Cir.1978); *See also* 1965 U.S.C.C.A.N., Vol. 2 at 2931; *Quality Exchange, Inc. v. Universal Air Freight, Inc.,* 574 F.Supp. 622 (D.C.N.C. 1983). A "clear" violation is one which is "openly and obviously unlawful." *Baggett Transp. Co. v. Hughes Transp., Inc.,* 393 F.2d 710, 714 (8th Cir.), *cert. denied,* 393 U.S. 936, 89 S.Ct. 297, 21 L.Ed.2d 272 (1968) (quoting 1965 U.S.C.C.A.N., Vol. 2 at 2931).

Enacted in 1982, 49 USC § 10922(c)(2)(A)–(I) authorizes the ICC to award a motor carrier of passengers certain scheduled intrastate authority in conjunction with scheduled interstate authority held by the carrier from the ICC. In *Funbus Systems, Inc. v. California P.U.C.,* 801 F.2d 1120 (9th Cir.1986), the court held that while the ICC could issue such intrastate authority, there must nonetheless be an actual, *bona fide* interstate service. The court remanded the matter to the ICC for delineation of the criteria under which such authorities would be issued.

After the decision of the Ninth Circuit in *Funbus,* but before the disposition of the ICC on remand, Congress added 49 U.S.C. § 10922(c)(2)(J) which states:

> Each certificate issued under this paragraph to provide intrastate transportation of passengers on any route shall be subject to a condition which limits the authority of the carrier to provide intrastate transportation service under the certificate only if the carrier provides the regularly scheduled interstate transportation service on the route.

Based on this provision and its legislative history, along with the Ninth Circuit decision, on remand, the ICC in *Funbus,* noted the required interstate transportation must be an actual regularly scheduled service, it must be *bona fide* and involve service in more than one state, and it must be substantial on the issue of what constitutes "substantial" interstate service, the ICC stated:

Our prior decision in these proceedings explained that it not enough for the carrier merely to offer interstate transportation on the route over which it conducts intrastate service. The interstate service must be active. Moreover, the intrastate service may not operate independently of the interstate service, but instead must be conducted as part of existing interstate services. We further pointed out that the required interstate transportation must be an actual regularly scheduled service, it must be *bona fide* and involve service in more than one State, and it must be substantial. However, the interstate and intrastate services need not be identical or provided in the same vehicle. As to the requirement that the interstate traffic be substantial, we indicated in the prior decision that a carrier must submit evidence that over a reasonable period of time it has carried a substantial number of passengers in interstate commerce. We also noted that, since the interstate traffic is to be substantial in relation to the intrastate traffic, the information submitted to establish the lawfulness of the intrastate service should include intrastate traffic figures. We further noted that data addressing the overall level of bus passengers in the area may also be relevant. *Funbus Systems, Inc.—Interstate Operations—Petition for Declaratory Order*, 1988 Fed.Car.Cas. ¶ 37,536. The ICC went on to conclude that the interstate operation in question there was not substantial since it consisted of only .025 percent of the intrastate traffic over the route.

ALS argues that the 1992 decision in *Boulder Airporter, Inc. v. Stapleton Stagecoach, Inc. d/b/a Stapleton Supercoach, Inc.* MC–C–30175, holds that a 24% ratio of interstate service is insufficient to establish a "substantial interstate service." ALS submits that the CME's latest Time Schedule and 1989–1994 Annual Reports filed by CME, under penalty of perjury with the Colorado Public Utilities Commission clearly establish that CME did not declare any scheduled revenues for 1989–1992 and the declared interstate scheduled revenues in 1993 and 1994 were well below any acceptable standard for substantial interstate service.

CME maintains ALS has misinterpreted the *Boulder Airporter* case. CME asserts that the initial decision by the Administrative Law Judge and the subsequent affirmance by the ICC held that the carrier failed to establish that the interstate operations were substantial because the carrier presented evidence only of the number of interstate passengers for a brief period of time, with no corresponding evidence offered of the number of intrastate passengers, so that no meaningful comparison of the two could be made. The ICC Administrative Law Judge's reference to a 24% figure used by the ICC in the remand simply illustrated a comparison of interstate and intrastate transportation was necessary and that the respondent had failed to provide the necessary information with which to make the comparison.

As CME notes the ICC, in its decision on remand from *Airporter of Colorado, Inc. v. I.C.C.*, 866 F.2d 1238 (10th Cir.1989), found that a 24% ratio of interstate to intrastate passengers moving from Stapleton International Airport to Wyoming points and a 28% ratio on the return trip was in fact "substantial" interstate transportation over the routes in question. *See Collins Coaches Ltd. Common Carrier Application*, 1990 Fed.Car.Cas. ¶ 37,781. In the decision affirming the administrative law judge in *Boulder Airporter*, the ICC rejected the complainant's argument that a specific minimum numerical standard must be met.

CME asserts, contrary to ALS' argument, there is no industry standard prescribing a minimum ratio or interstate service which controls each case. Since there are no objective factual criteria against which one can determine that a clear violation has occurred, CME maintains I must deny the relief sought under 49 U.S.C. § 11708. Further, CME states any doubts as to whether CME's interstate service is not "substantial" within the meaning of 42 U.S.C. § 10922 is a question within the primary and exclusive jurisdiction of the ICC. Finally, CME argues, if the existence or nonexistence of "substantial" interstate service were tested according to the ordinary meaning of the word, 25% of approximately 11,000 passengers in 1994

would seem to fall within a practical definition of the word "substantial."

ALS concedes in its motion for preliminary injunction that transportation of a portion of an interstate passenger's journey in a single state, here Colorado, can constitute a movement in interstate commerce. (Mem. Law Supp. Mot. Prelim. Inj. ¶ 11.) It then urges that the "through ticketing" or "common arrangement" requirement of interstate passenger transportation may be satisfied only by a showing of such through ticketing between the ground carrier performing the single-state "leg" of the through movement having an out of state origin or destination, and an air carrier, or by some other "common arrangement" between the motor carrier and the airline, and which may not include prearrangement for such transportation by a third party. (*Id.* ¶¶ 13–15).

The requirement of evidencing transportation of passengers in interstate commerce, but whose ground "leg" of the journey lies in a single state was first expressed by the Supreme Court in *United States v. Yellow Cab Company*, 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947). The Court held a local taxi service in Chicago which provided taxi service to patrons traveling to or form Chicago's Union Station in connection with their rail transportation trips was purely local in character in the absence of a contract or other arrangement for continuous or "through" transportation.

Certain ICC decisions construe *Yellow Cab* as requiring that, in the absence of a through ticket, any "common arrangement" be solely between carriers and not with third persons, such as travel agents which may have put together a "package" including both the single-state ground and out of state air transportation involved. It is on such decisions that ALS relies. *See Motor Transp. of Passengers Incidental to Air*, 95 M.C.C. 526, 536 (1964); *Kimball—Petition for Declaratory Order*, 131 M.C.C. 908, 918 (1980) (holding "[t]he [only lawful interstate] 'common arrangement' or through ticketing ... is an arrangement between a motor carrier and the air carrier.")

CME maintains federal courts have long since rejected this view of expressed by the ICC in 1964 and 1980 and have held that, properly understood, the Supreme Court's decision in *Yellow Cab* holds such interstate or "through" transportation need only be prearranged and that "common arrangements" do not consist only of those between carriers. *See, e.g., Executive Town & Country Services, Inc. v. City of Atlanta*, 789 F.2d 1523, 1526 (11th Cir.1986) (local trips involved arose from ground and air trips prearranged other than as through ticketing or common arrangement between air and ground carriers and Atlanta could not prescribe their minimum fares consistent with the commerce clause); *Charter Limousine, Inc. v. Board of County Comm'rs*, 678 F.2d 586 (5th Cir.1982) (persons whose through transportation by air and ground carrier, the latter portion of which was wholly within Florida, and which was prearranged by third parties, were clearly interstate passengers.) *See also Southerland Tours v. St. Croix Taxicab Ass'n*, 315 F.2d 364 (3d Cir.1963); *Airport Taxi Cab Advisory Comm. v. City of Atlanta*, 584 F.Supp. 961 (N.D.Ga.1983).

CME asserts its passenger traffic consists of a combination of through ticketed operations between CME and at least one air carrier, other "common arrangements" between CME and many carriers, and prearranged transportation booked in advance by such third parties as travel agents, international tour operators and meeting co-ordinators. CME states collectively transportation of such passengers amounted to over 25% of CME's regular route business conducted under its ICC certificates. According to CME, its reports to the PUC, upon which ALS relies, are inaccurate and CME is in the process of amending the mistaken reports to reflect the appropriate portion of its regular route business conducted in interstate commerce consistent with this analysis. CME maintains its transportation service is entirely lawful and ALS' position is meritless.

In its rebuttal statement, ALS argues the circuit court decisions cited by CME in support of its contention that common arrangements need not be between air and ground carrier do not apply to the specific statutory issues presented by 49 U.S.C. § 10922(c)(2)(B) and (J). While this may be

true, it cannot be stated with certainty that the ICC would not apply the same less restrictive interpretation as to what constitutes a through ticketing or other common arrangement in interpreting the statutory sections at issue here.

ALS makes the assertion in its rebuttal that further research shows the suggestion that the "through ticketing doctrine" may be used to validate an intrastate authority under 49 U.S.C. § 10922(c)(2)(J) has been rejected. In support of this contention, it cites the ICC decision in *Funbus,* No. MC–C–10917 (1984), the Ninth Circuit's decision in *Funbus,* 801 F.2d 1120 (1986) and the legislative history to subsection (J) of 49 U.S.C. § 10922(c)(2). In its rebuttal, ALS takes the position that in order for the intrastate service to be considered valid, the ground carrier itself, in this case CME, must provide the "actual service across state lines" and the combined service of air and ground carrier does not suffice.

While the authorities cited by ALS create some question as to whether CME has acted in violation of its ICC certificates, such violation, if it exists, is by no means a "clear" violation, i.e. it is not "openly and obviously unlawful." *See Baggett Transp. Co. v. Hughes Transp., Inc.,* 393 F.2d at 714. This not only precludes my jurisdiction to grant an injunction under 49 U.S.C. § 11708, *Quality Exchange, Inc. v. Universal Air Freight, Inc.,* 574 F.Supp. at 626, but precludes as well a finding that ALS has a substantial likelihood of succeeding on the merits. For this reason, I deny the motion for preliminary injunction.

### (2) *Irreparable Injury.*

 ALS maintains it could sue for money damages, but such damages would be awarded "after the fact" of its destruction by the diversion of revenues through the alleged unlawful operations of CME. ALS states that by virtue of its being a debtor in bankruptcy seeking to reorganize its financial affairs, it lacks an adequate remedy at law to prevent immediate and irreparable harm caused by the allegedly unlawful operations. (Mot.Prelim.Inj. ¶¶ 14–15.)

CME counters any injury to ALS is as a result of ALS ceasing to provide regular route service which created the demand for transportation to be provided by CME. CME maintains it has the required ICC authority and financial means to augment its existing service in Eagle County and also to begin operation in Pitkin County. CME contends ALS's alleged injury is due to lawful business competition and to the extent ALS could prove such competition unlawful, it would have an adequate remedy in the form of money damages.

I agree. There is no merit in ALS's suggestion that its injury is rendered irreparable because of its having filed a Chapter 11 petition and that it is thereby disabled from resisting CME's competition. Because ALS has not demonstrated there is no adequate remedy at law, it has not shown it will suffer irreparable injury. I deny the motion for preliminary injunction on this ground as well.

### (3) *Injury from failure to grant the preliminary injunction.*

 ALS is required to show the threatened injury to it outweighs whatever damage the proposed injunction may cause CME. CME asserts if the requested injunction were granted prohibiting CME from conducting its scheduled passenger services under its ICC certificates pending trial, this would require the shutdown of the overwhelming majority of its business.

Accordingly, even if ALS could show it will suffer irreparable injury absent the granting of injunctive relief, it has not shown such threatened injury outweighs that which CME would suffer if I were to grant the relief sought.

### (4) *Public Interest.*

ALS is required to show the injunction, if issued, would not be adverse to the public interest. CME submits the public interest factor weighs heavily in its favor because the ICC has determined that the operations in which CME is engaged and on which it is about to embark are required by "the public convenience and necessity." If the injunctive relief were granted, it would require the virtual shutdown of the majority of CME's business which in 1994 involved the transpor-

tation of over 160,000 total passengers and the generation of approximately $6,000,000 in revenue. CME maintains this would not only deprive families of support and diminish the state's mountain economy in other ways but would leave the riding public to utilize a vastly diminished ALS service offered by a carrier in Chapter 11 bankruptcy.

ALS has not established the injunction sought would not be adverse to the public interest. I deny the motion for preliminary injunction on this ground too.

### V. *Conclusion.*

ALS' motion for a preliminary injunction is denied first because I lack jurisdiction under 49 U.S.C. § 11708 in that ALS has not established CME to be "in clear violation" of 49 U.S.C. § 10922 and second because ALS has not established it is entitled to injunctive relief under the settled principles applicable in the consideration of a Rule 65(a) motion. Accordingly,

IT IS ORDERED THAT the Motion for Preliminary Injunction (49 U.S.C. § 11708; Rule 65, F.C.R.P.) is DENIED.